Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Morton Denlow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 6435 | **DATE** | 7/25/2002 |
| **CASE TITLE** | Tony Ishmael vs. Jo Anne B. Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Plaintiff's motion for summary judgment [13-1] is denied. Defendant's motion for summary judgment is granted, and the Commissioner's decision finding Plaintiff not disabled is affirmed.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | number of notices | | **Document Number** |
| ✓ | Notices mailed by judge's staff. | JUL 2 9 2002 | | |
| | Notified counsel by telephone. | date docketed | | |
| | Docketing to mail notices. | | | 19 |
| ✓ | Mail AO 450 form. | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | 7/25/2002 | | |
| | | date mailed notice | | |
| DK courtroom deputy's initials | | DK mailing deputy initials | | |

U.S. DISTRICT COURT

02 JUL 25 PM 4: 55

Date/time received in central Clerk's Office

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **TONY ISHMAEL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 01 C 6435** |
| **v.** | ) | |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | **Magistrate Judge Morton Denlow** |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**DOCKETED**

**JUL 29 2002**

## MEMORANDUM OPINION AND ORDER

Plaintiff Tony Ishmael ("Claimant" or "Ishmael") seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), Jo Anne B. Barnhart, denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act, Title II, 42 U.S.C. §§ 416(i) and 423. Ishmael claims the Commissioner's decision to deny him benefits should be reversed because it is contrary to law and not supported by substantial evidence. Both parties now move for summary judgment. For the reasons stated herein, this Court affirms the Commissioner's decision and denies Ishmael's motion for summary judgment and grants the Commissioner's motion for summary judgment.

## I. RELEVANT FACTS

Ishmael was born on July 31, 1953. (R. 271). He completed the tenth grade, reads at a sixth grade level and has performed numerous past jobs including die cutter, gas station attendant, plumbing laborer, school custodian, and roofing laborer. (R. 191, 353). Ishmael

stopped working in May 1992 after sustaining a back injury. (R. 173). He underwent back surgery in November 1992 and returned to work in June 1993. (R. 289). He obtained a worker's compensation settlement as a result of his injury. (R. 174). The physical therapist managing his work hardening program indicated he could perform at the exertional capacity of medium work. (R. 381).

Ishmael filed a previous claim for disability benefits on November 2, 1993. (R. 14). After his claim was denied at the initial and reconsideration stages, he filed a timely request for a Social Security Administration ("SSA") Hearing, and his case was heard by Administrative Law Judge ("ALJ") John Horn. (Id.). On August 21, 1995, the ALJ issued an unfavorable decision from which Ishmael filed an untimely request for review by the Appeals Council. (Id.). On November 9, 1996, the Appeals Council dismissed the request, making the ALJ decision a final administrative determination for the period through August 21, 1995. (Id.) Ishmael has not performed any work activities since January 1995. (R. 17).

In September 1996, Ishmael filed a new application for a period of disability and disability insurance benefits ("DIB"). (Id.). In addition to his prior physical impairment, Ishmael claims a new mental impairment should be factored into the determination of his disability. (R. 47, 126). His claim was initially denied on December 30, 1996, and again on reconsideration on June 11, 1997. (R. 15). A timely request for a hearing was filed on July 25, 1997, and a SSA Hearing was held on February 25, 1999 before ALJ Helen G. Cropper.

## A. Ishmael's Hearing Testimony

Ishmael testified at the February 25, 1999 hearing. He has not been gainfully employed since his prior hearing with ALJ Horn in 1995. (R. 60-61). Although, Ishmael tried to find other work, such as at a bakery or a supermarket, the heavy lifting inherent in such work precluded him from engaging in those activities. (R. 64). He also applied for a job at McDonald's but was apparently rejected on account of his prior worker's compensation claim. (R. 65). Nonetheless, Ishmael implied he could not work at McDonald's because he could only stand for a maximum of twenty minutes before his feet burned and his knee hurt. (*Id.*). He further stated that Dr. Ahsan prescribed Darvocet, which eases some of his pain. (R. 58, 64).

Ishmael testified he does not have any mental or emotional problems. (R. 94). He further stated no one else thinks he has mental or emotional problems, and affirmed this statement during reexamination by his attorney. (R. 94, 100). Additionally, Ishmael never took any medication for mental or emotional problems, and although Dr. Ahsan once prescribed Buspar for possible anxiety and depression, Ishmael never filled the prescription. (R. 94, 323-24).

On a typical day, Ishmael wakes up between 5:30 and 6:00 A.M. (R. 68). He drives his children to school, and on the way home he may stop by his pastor's house or take his mother to her doctor. (R. 70). Ishmael's wife will usually fix him something for lunch or he may go to McDonald's. (R. 71). After lunch, Ishmael does activities around the house

including washing dishes, vacuuming, or folding clothes. (R. 65, 72). Sometimes he has a doctor's appointment or picks up his kids from school. (R. 72). Occasionally, he may pick up the pastor's child from basketball practice. (*Id.*). Ishmael's wife works at night, leaving Ishmael alone with the children. Ishmael eats dinner with his children and helps them with their homework. (R. 73).

Ishmael goes to church on Sunday morning, Sunday night, and Wednesday night. (*Id.*). The Sunday morning service lasts almost three hours and Ishmael must get up and move around. (R. 73-4). He now uses a riding lawn mower as opposed to the pushing mower he previously used. (R. 77). He can carry light grocery bags containing items such as cereal or crackers but not heavy bags containing items such as bottles, cans, or sugar and flour. (R. 78). He can lift a gallon of milk with both hands. (R. 98). Finally, Ishmael has difficulty lifting his arms over his head to put on his shirt. (R. 97).

## B.   Medical Evidence

The medical evidence in this case consists of records from Ishmael's visits to orthopedic specialist Dr. Dwight Woiteshek, family practitioner Dr. Azeem Ahsan, the report of neurologist Dr. Ramsis Ghaly, the reports of consulting physicians Dr. Yatin Shah and Dr. James Ahstrom, the report of psychiatric examinations conducted by Dr. Nazzareno Lieghio and Dr. Elsy Devassy, the report of a psychological examination conducted by Dr. Edwin Baukus, and a psychiatric review performed by Dr. Kirk Boyenga.

### 1. Dr. Woiteshek

Ishmael was treated by orthopedic specialist Dr. Woiteshek for back problems in 1992 and 1993. Dr. Woiteshek performed microlaminectomy surgery on Ishmael in November, 1992, excising Ishmael's L5-S1 disc. (R. 289). In June 1993, Ishmael was released to return to work. Dr. Woiteshek reported he last saw Ishmael on July 12, 1993. (R. 288).

### 2. Dr. Ahsan

Dr. Ahsan served as Ishmael's treating family physician and treated Ishmael for various conditions from June 14, 1994 through April, 1998. (R. 390). To relieve Ishmael's recurrent complaints of back pain, Dr. Ahsan prescribed Vicodin and Darvocet. (R. 293-298). Dr. Ahsan also noted that Claimant had bad nerves and diagnosed him with anxiety neurosis. (R. 293, 323, 324). Although Dr. Ahsan prescribed Buspar, Ishmael failed to fill the prescription and the evidence suggests the matter was not dealt with again. (R. 323, 324). In addition, Dr. Ahsan recommended Ishmael see a psychiatrist but Ishmael disregarded that referral. (R. 318).

In April 1999, Dr. Ahsan completed a residual functional capacity ("RFC") questionnaire in which he noted Ishmael's pain limited daily activity. (R. 390). However, Dr. Ahsan failed to find any emotional factors contributing to the severity of Ishmael's pain and functional limitations, and did not check any boxes pertaining to psychological conditions affecting Ishmael's physical condition. (R. 390). Dr. Ahsan opined that Claimant could not perform even "low stress" jobs. (R. 391).

5

### 3. Dr. Ghaly

Dr. Ghaly, a neurologist, performed a consultative examination of Ishmael in May 1997. Ishmael claimed he was taking about five Darvocet daily for his back pain. (R. 336). Upon examination, Dr. Ghaly noted Ishmael had some burning leg pain during straight leg raises, but otherwise found normal neurological conditions. (*Id.*).

### 4. Dr. Shah

Dr. Shah performed a forty-minute consultative examination on November 6, 1996. (R. 301-304). Although he found no anatomic abnormalities, he observed pain and slight restriction of motion in Ishmael's left shoulder. (R. 303). Additionally, Dr. Shah's diagnostic impression included a herniated disc of the lumbrosacral spine, status post laminectomy, chronic low back pain, and left shoulder pain. (R. 304). Nonetheless, Ishmael told Dr. Shah he was able to do daily activities without any difficulty. (R. 301).

### 5. Dr. Ahstrom

Dr. Ahstrom performed a consultative orthopedic examination of Ishmael on June 26, 1998. Dr. Ahstrom noted Ishmael walked normally, without any external aids. (R. 366). Ishmael reported to Dr. Ahstrom that he took Darvocet and Vicodin to relieve pain in his back, shoulders, hips, and knees. (*Id.*). On examination, Ishmael's back was tender and his range of motion of his back and shoulders was less than normal. (R. 366-67). In Dr. Ahstrom's opinion, Ishmael's capacity to work would be limited by his subjective complaints of pain despite "very little evidence of a neurologic deficit." (R. 367). Finally, Dr. Ahstrom

noted very little objective findings existed with respect to Ishmael's pain. (*Id.*).

### 6.  Dr. Liegghio

Dr. Liegghio, a psychiatrist, performed a consultative examination on Ishmael in November 1996. (R. 305-7). Ishmael reported his pain precluded him from many daily activities. (R. 305). Besides occasionally fishing, Ishmael remains "quite reclusive." (*Id.*). Dr. Liegghio diagnosed probable Bi-polar type disorder and Attention Deficit Hyperactivity Disorder ("ADHD") and further noted Ishmael would benefit from a psychological evaluation and would probably respond to medications to treat these conditions. (R. 306).

### 7.  Dr. Devassy

On May 14, 1998, Ishmael underwent another psychiatric consultative examination, by Dr. Devassy. Ishmael reported he could do very little household chores because of his back pain. (R. 362). However, on days when his pain is light he may fold clothes, wash dishes, or mow the lawn with a riding lawn mower. (*Id.*). In addition, Ishmael reported he occasionally goes fishing and socializes with friends and attends church every Sunday, although he must move around during the church service. (R. 363). Dr. Devassy diagnosed possible opiate abuse due to Ishmael's reported daily dose of narcotic-strength pain medication. (R. 365). Dr. DeVassy described Claimant to be of average intelligence, capable of understanding instructions, emotionally stable, and socially well adjusted. (R. 364).

### 8.     Dr. Baukus

Dr. Baukus performed a psychological examination of Ishmael in May, 1998. Ishmael reported he completed tenth grade and was attending GED classes at a local college. (R. 350). He further reported he was teaching his daughters in an in-home schooling program. (*Id.*). Ishmael's daily activities included light household chores, repairing his daughters' bicycle and his car, and yard work. (R. 352). Additionally, Ishmael told Dr. Baukus, he serves as secretary of the men's club in his church, watches television, tinkers with toy trains, and visits with friends and family. (*Id.*).

Dr. Baukus reported Ishmael reads at a sixth grade level and scored a 75 on the IQ test. (R. 353). In reviewing the results of the Minnesota Multiphasic Personality Test ("MMPI-2"), Dr. Baukus noted the likelihood Ishmael was over-reporting his psychopathology, creating a "very high probability that all scale scores are invalid and the [MMPI-2] profiles are uninterpretable." (R. 355-6). Ultimately, Dr. Baukus diagnosed chronic pain disorder and noted Ishmael did not meet the criteria for somatization disorder because he did not report somatic symptoms before age thirty, and he did not present any sexual symptoms. (R. 358).

### 9.     Dr. Boyenga

At the request of the Disability Determination Service ("DDS"), Dr. Boyenga prepared a Psychiatric Review Technique Form ("PRTF") in December, 1996. (R. 232-40). After reviewing the medical evidence, Dr. Boyenga concluded there may be some signs of

mental impairment but overall those problems did not significantly affect Ishmael's ability to function. (R. 239).

## C. Medical Expert Dr. James T. Bianchin

The medical expert ("ME") present at Ishmael's hearing, Dr. James T. Bianchin, reviewed all the medical evidence and determined Ishmael did not meet or equal a listing-level impairment. (R. 107). The ME testified the only significant finding was some limited lumbar motion. Although the ME recognized Ishmael's subjective complaints of pain, such pain was not clearly supported by significant objective findings. (R. 108). The ME further testified Claimant retained the capacity to lift twenty pounds occasionally and ten pounds frequently, sit for six hours out of an eight hour day with brief hourly postural changes, walk and climb stairs frequently, use ladders occasionally and stoop and crouch in a limited fashion. (R. 109). The ME also testified if Ishmael's testimony were accepted despite the absence of objective medical evidence, Ishmael would be limited to work performed below the shoulder level. (R. 109-110). Finally, the ME referenced Dr. Ahstrom's review of the CAT scan in 1997, stating it was suggestive of a herniated disc but the ME noted Dr. Ahstrom never made findings consistent with that analysis. (R. 112). The ME testified if Dr. Ahstrom were seriously pursuing Ishmael's injury along those lines, he would have insisted on additional diagnostic studies. (R. 113).

## D.   Vocational Expert Cheryl R. Hoiseth

The vocational expert ("VE") present at Ishmael's hearing, Cheryl R. Hoiseth, testified Ishmael's past relevant jobs consisted of heavy, unskilled work. (R. 118). The VE further stated a hypothetical individual with Claimant's vocational characteristics who could perform a full range of light exertional work subject to not climbing scaffolds or constant overhead lifting or reaching could not perform any of Ishmael's past relevant work. (R. 118-19). However, the VE identified other jobs in the metropolitan Chicago area that could be performed at the light exertional level, including cashier (45,000 jobs); kitchen helper (5,000); fast food worker (28,000); hand packager (9,400); assembler (21,000); and parking lot attendant (2,700). (*Id.*). The ALJ then asked the VE to consider the same hypothetical but at the sedentary level. (*Id.*). Although the sedentary level eliminated the kitchen helper, fast food worker, and parking lot attendant, the VE testified 16,000 sedentary cashier jobs were available in Chicago in addition to approximately 3,000 sedentary hand packager jobs and 4,500 sedentary assembly jobs. (R. 120). The VE also testified these sedentary jobs would allow the worker to stand for up to five minutes after sixty continuous minutes of sitting, and would cause the worker to be distracted by pain less than fifty percent of the time. (R. 120-21).

## E.   The ALJ's Decision

On April 30, 1999, ALJ Cropper determined Ishmael was not entitled to a period of disability or to disability insurance benefits. (R. 14-32). In reaching this conclusion, the ALJ

engaged in the five-step analysis required by SSA regulations. 20 C.F.R. §§ 416.920, 404.920. The ALJ thoroughly assessed each step of the analysis, and although finding some limitations, she ultimately concluded Ishmael was not disabled because he could perform a significant number of light-work jobs in the Chicago economy. (R. 11-36). The ALJ determined Ishmael was not engaged in substantial gainful activity, thus meeting the standards for step one. (R. 16-17).

The ALJ also concluded at step two that Ishmael's back impairments met the low threshold of severity necessary to proceed to the next step. (R. 17). Although the ALJ was cognizant of possible mental impairments, she declined to discuss them in detail at this point because the severity threshold had already been satisfied. (*Id.*).

At step three, the ALJ concluded disability could not be established because Ishmael's condition did not meet or equal a listing-level impairment or combination of listing-level impairments. (R. 17-22). Specifically, the ALJ found no clear evidence to establish the persistent abnormal neurological findings required to meet listing 1.05(c). (R. 19). The ALJ also was unable to conclude Ishmael suffered from substance dependence under 12.09 because the evidence did not establish that Claimant's use caused or contributed to any related listing-level physical or mental impairment. (R. 19-20). Additionally, although the ALJ found some evidence depicting possible mental impairments pursuant to 12.06 (anxiety) and 12.07 (somatoform disorder), she ultimately determined Claimant did not suffer from a listing-level mental impairment. (R. 20-22).

After thorough review, the ALJ found the objective medical evidence did not establish a listing-level impairment. (R. 21). Although Ishmael reported feelings of anxiety or nervousness to Dr. Ahsan, Ishmael apparently was able to manage those feelings without further treatment or medication. (*Id.*). Moreover, Dr. Ahsan's notes did not establish the basis for his "anxiety neurosis" diagnosis and because Dr. Ahsan is not a specialist, the ALJ did not give his opinion controlling weight. (*Id.*). Additionally, the ALJ found the psychiatrists and psychologist were unable to definitively diagnose a mental problem in Ishmael. (*Id.*). Claimant relied on Dr. Baukus' report of a possible somatoform disorder, but the ALJ recognized Dr. Baukus' did not diagnose somatoform disorder because a primary diagnostic criterion for somatoform disorder was absent. (*Id.*). In addition, the ALJ observed "that Dr. Baukus believed that Claimant was intentionally overstating the extent of his pain." (*Id.*). The ALJ determined no severe impairment after carefully reviewing the record. Her decision was based on a thorough examination and a detailed explanation of her conclusions.

At step four, the ALJ determined Ishmael was unable to return to any past relevant work. In her analysis of Claimant's RFC, the ALJ concluded Ishmael had the mental RFC to sustain unskilled work and to concentrate on and sustain simple, unskilled tasks. (R. 29). In addition, Ishmael had the physical RFC to perform close to the full range of work at the light exertional level. (R. 28). Therefore, because Ishmael's past jobs included medium and heavy work, the ALJ found Ishmael lacked the RFC to return to his past relevant work. (*Id.*).

12

After the burden shifted to the Commissioner at step five, the ALJ looked to Medical-Vocational Rules 202.17 and 202.18 of Table No. 2 and 202.18 and 202.19 of Table No. 1, Appendix 2, Subpart P, Regulations No. 4 in conjunction with the testimony of the VE to determine whether Ishmael could still perform a significant number of sedentary and light jobs in the economy. (R. 29). The ALJ ultimately concluded Ishmael could perform other work, rendering him not disabled as defined by the SSA, and consequently denied Ishmael's DIB claim. (R. 29-30).

Following the ALJ's decision, Ishmael requested review by the Appeals Council. On June 19, 2002, the Appeals Council denied Ishmael's request for review, thus the ALJ's decision stands and becomes the final decision of the Commissioner. (R. 6).

Currently before this Court are Ishmael's and the Commissioner's cross-motions for summary judgment. Ishmael contends the ALJ's decision to deny him benefits was contrary to law and was not supported by substantial evidence. Oral argument was held July 15, 2002. For the reasons stated herein, Ishmael's motion is denied and the Commissioner's decision is affirmed.

## II. LEGAL STANDARDS

Judicial review of a Commissioner's final decision is governed by 42 U.S.C. § 405(g) which provides the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971). In other words, the ALJ's findings must be supported by more than a mere scintilla of the evidence. *Id.*

A reviewing court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). Rather, judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching its decision and whether there is substantial evidence in the record to support the findings. 42 U.S.C. § 405(g); *Scivally v. Sullivan*, 996 F.2d 1070, 1075 (7th Cir. 1992). The SSA gives a court the power to enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a hearing." 42 U.S.C. § 405(g).

In order to be entitled to DIB under Title II of the SSA the claimant must establish a "disability" as defined by the Social Security Act. To establish a "disability" the claimant must show he is suffering from a medically determinable physical or mental impairment which can be expected to result in death or, which has lasted or can be expected to last for at least twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Additionally, an individual shall be considered disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Social Security Regulations provide a five-step process to determine whether a claimant has established a "disability." 20 C.F.R. § 404.1520. The process is sequential; if the ALJ finds that the claimant is not disabled at any step in the process, the analysis ends. *Id.* The ALJ must inquire: 1) whether the claimant is still working; 2) whether the claimant has a severe impairment; 3) whether the claimant's impairment meets or equals a listed impairment; 4) if the claimant does not suffer from a listed impairment, whether he can perform past relevant work; and 5) whether the claimant is capable of performing any work in the national economy. *Id.*

## III. ANALYSIS

The issues presented are: 1) whether the ALJ's determination that Ishmael did not suffer from a severe mental impairment was based on substantial evidence; and 2) whether the ALJ erred by relying on the ME's testimony.

## A.     The ALJ's Decision was Supported by Substantial Evidence

Ishmael contends the ALJ erred in her treatment of Ishmael's psychological impairment. First, he argues the ALJ did not adequately address the mental impairment at step two. However, the severity step is a threshold screening step. *Taylor v. Schweiker*, 739 F.2d 1240, 1243 (7th Cir. 1984). Therefore, because the ALJ determined in step two that Ishmael's back impairment met the severity threshold required to proceed to the next step, it was not necessary to discuss any mental impairment at that stage in the analysis. The ALJ found a severe back impairment and correctly stated, "Since claimant has at least one

documented severe impairment, the analysis must proceed to the next step." (R. 17). The ALJ clearly noted the possible existence of other impairments but identified the redundancy in addressing them at that point. *Id.*

Claimant argues the ALJ wholly disregarded the evidence of psychological impairments, focusing instead on physical impairments alone. Contrary to Ishmael's suggestion, the ALJ discussed and considered Ishmael's mental impairments in great detail throughout the remainder of her decision. (R. 19-29). For example, in determining whether Ishmael suffered from a listing-level mental impairment at step three, she consulted evidence from several doctors including Dr. Ahsan, Dr. Liegghio, Dr. Baukus, Dr. Devassy, and Dr. Boyenga. (R. 20-21). And, in step four, when the ALJ was assessing Claimant's RFC, she again revisited the evidence with respect to Ishmael's mental state. (R. 25-29). Claimant's argument that the ALJ disregarded evidence of psychological impairments while focusing on physical impairments alone is without merit.

Ishmael's second argument challenges the basis of the ALJ's finding of no severe mental impairment. Specifically, he argues the ALJ did not base her decision on substantial evidence. Substantial evidence is defined as, "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. In making a decision, the ALJ must articulate her analysis of the evidence. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). She is not required to address every piece of evidence or testimony, but must provide some glimpse into her reasoning. *Id.* Where an ALJ denies

benefits, she must build an accurate and logical bridge from the evidence to her conclusion. *Id.* Despite Ishmael's contention, the ALJ was extremely thorough in her approach to this issue, basing her decision on substantial evidence from Ishmael's SSA hearing in addition to objective medical evidence from the record to reach a well-reasoned, logical conclusion.

First, the ALJ thoroughly reviewed the medical and non-medical evidence. In arriving at her conclusion, the ALJ relied on Ishmael's own statement that he was not mentally impaired and that he never took medication to treat any mental or emotional problem. While this Court understands people with impairments are often reluctant to acknowledge those impairments, the ALJ still relied on other substantial evidence to conclude Ishmael did not suffer from a severe mental impairment. According to Ishmael's treating physician, Dr. Ahsan, any functional limitations imposed on Ishmael were wholly unrelated to emotional problems. (R. 390). Moreover, Ishmael's typical day indicates he can function quite normally. Not only does Ishmael do light household chores, including folding clothes, washing dishes and vacuuming, he also functions outside the house, driving his children to school, playing an active role in the church, and occasionally going fishing. (R. 65, 72, 305, 352). In fact, Ishmael told Dr. Shah he can do his daily activities without any difficulty. (R. 301).

In addition to Ishmael's testimony, the ALJ reviewed the reports of consultative examinations to find objective medical evidence regarding mental impairments. (R. 20). First, she looked at the report of psychiatrist, Dr. Liegghio who diagnosed a probable Bi-

polar disorder and ADHD. *Id.* Then she discussed Dr. Baukus's report which indicated Ishmael was over-reporting the extent and severity of his problems. (R. 20-21). The ALJ also reviewed the report of Ishmael's second psychiatric exam, in which Dr. Devassy diagnosed possible opiate abuse. (R. 21). Finally, she reviewed the PRTF completed by Dr. Boyenga, who found some signs of mental impairments, but nothing that would significantly limit Ishmael's ability to function. *Id.*

After considering the totality of the evidence, the ALJ concluded Ishmael did not suffer a listing-level impairment. *Id.* She noted despite Ishmael's reported feelings of anxiety or nervousness, he apparently was able to manage those feelings without further treatment or medication. *Id.* Furthermore, she pointed to the fact that the psychiatrists and the psychologist who performed consultative examinations were unable, generally, to definitively diagnose a significant mental problem in Ishmael. *Id.* Even though Dr. Boyenga opined Ishmael's record did indicate some signs of mental impairment, he did not believe those problems would substantially affect Ishmael's functionality. *Id.*

The ALJ made an informed decision based upon Ishamael's own testimony. Moreover, the objective evidence indicated Ishmael functioned normally despite his repeated complaints. Therefore, the ALJ had substantial evidence to conclude Ishmael did not suffer from a severe listing-level mental impairment, and her conclusion was supported by that evidence.

**B.    The ALJ Did Not Err in Relying on the ME's Testimony**

Ishmael asserts the ME made two factual errors in his testimony, and therefore the ALJ's reliance on the ME's testimony was misplaced.  First, Ishmael contends the ME did not consider the results of the 1997 CAT scan when forming his opinion.  Ishmael also argues the ME factually erred by suggesting Ishmael was not taking narcotic drugs.

Claimant argues the ME's testimony is invalid because it does not reflect the results of the 1997 CAT scan.  When asked to evaluate Ishmael's physical condition, the ME stated:

> The only hard medical evidence that I have, when I'm talking hard medical evidence I'm talking about the findings, I'm not talking about testing, is the CE (consultative examination) of '96 and the CE of '98. And the most recent CE doesn't show much more than some limitation of motion or flexion I mean forty-five degrees.  There's no evidence of muscle spasms.  There is no follow-up record that I have seen that muscle spasms are the primary concern.  So with that and full neurological findings, I think he can lift twenty pounds occasionally and ten pounds frequently.

(R. 109).  Although, the ME does not address the CAT scan in the preceding answer, he does take it into consideration when delivering his opinion to the ALJ.  Later in his testimony, he mentioned that while the CAT scan might suggest an abnormality, Ishmael never had clinical findings consistent with a herniated disc.  (R. 112-14).  He explained that a CAT scan is not enough to accurately diagnose an impairment and assess the severity of limitations. *Id.*  Yet, the ME concludes Ishmael could only do light work, indicating Ishmael suffers from some physical impairments, just not completely debilitating impairments.  (R. 109-11).  The ME

also testified he reviewed all the medical evidence in the record, thus no reason exists to assume he did not include the results of the CAT scan into his RFC assessment. (R. 106-107).

Ishmael also argues the ME's testimony was factually inaccurate because the ME stated Ishmael was not taking narcotic medication. This argument is rejected because the ME said only that Ishmael was "not taking medication at a narcotic level." (R. 109). The reasonable meaning of this testimony is that Claimant did not take the drugs at such a level capable of producing a state of narcosis, a state marked by stupor or insensibility. See, Dorland's Illustrated Medical Dictionary, 1101 (28th ed. 1994).

Accordingly, the ME's testimony was not based on factual inaccuracies and the ALJ did not err by relying on the opinion of the ME.

## IV. CONCLUSION

The ALJ's hearing decision is a comprehensive, thoughtful opinion which is supported by substantial evidence. For the reasons set forth in this opinion, **Claimant's motion for summary judgment is denied, the Commissioner's motion for summary judgment is granted, and the Commissioner's decision finding Claimant not disabled is affirmed.** The Clerk of the Court is instructed, pursuant to Federal Rules of Civil Procedure 58, to enter judgment in favor of the Commissioner.

**SO ORDERED THIS 25th DAY OF JULY, 2002.**

*Morton Denlow*

**MORTON DENLOW**
**United States Magistrate Judge**

**Copies Mailed to:**

Robert C. Kielian
M. Jacqueline Walther
Kielian and Walther
33 West Jackson Blvd, Suite 201
Chicago, Illinois 60604
**Attorneys for the Plaintiff**

Kurt N. Lindland
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604

Edward J. Kristof
Assistant Regional Counsel
Social Security Administration
Office of the General Counsel, Region V
200 West Adams Street, 30th Floor
Chicago, Illinois 60606
**Attorneys for the Defendant**